IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09 CR 3006 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | SUPPLEMENTAL |
| MATTHEW RUEB, | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | |

    This matter is before me on the memorandum and order of Judge Kopf directing that a supplemental hearing be held to allow the parties the opportunity to adduce evidence relevant to the imposition of electronic monitoring and a curfew as conditions of release for this defendant. See Memorandum and Order of March 31, 2009, Filing No. 23. ("I want to know whether in each of these cases electronic monitoring and a curfew would be appropriate for the particular defendant. In other words, I want to know whether the Adam Walsh Amendments are unconstitutional as applied to each defendant.").

    A hearing was held before me on May 15, 2009. At that hearing the parties were informed that the court would take into account the information presented at the original detention hearing, and both parties were afforded an opportunity to present additional evidence. The government offered two exhibits, both of which were received. One is a forensic report titled "LPD Additional Case Information." It describes the analysis done by a person presumably named Donahue regarding the images found on the defendant's computer.[1] The

---

[1] The copy of Exhibit 1 provided to the court is not entirely clear. The right end of every line is cut off, presumably by a misalignment by the printer. The court has

government also offered Exhibit 2, which is a transcript of an interview with the defendant conducted by Investigator Weinmaster and Sgt. Donahue, both of the Lincoln Police Department, on September 10, 2008.[2] No oral testimony was presented.

Defendant offered Exhibit 101, which was also received. It is a statement of rules of the Summit Care and Wellness, PC Transitional Living Program, where the defendant has been residing since November, 2008. Defendant also proffered without objection a statement describing a "typical" week's schedule for the defendant in terms of his employment and attendance at AA/NA meetings. Defendant also presented no oral testimony.

## EVIDENCE

Information from the pretrial services report discloses that defendant is 31 years old and was born in Nebraska. Although he has lived other places, the most recent in Boulder, Colorado for eight years, he has lived in Lincoln the last five years. His father lives in Lincoln and his mother lives in Pakistan. He has no siblings. He has never been married, but has a son who is ten years old and who

---

requested a complete copy, but the government has not provided it. Therefore, my analysis is based on suppositions of the words and/or letters cut off from the right margin on each page. Despite the printer deleting the materials by moving the right margin to the left, the contents are discernable in nearly every instance; therefore I decided to go forward with this statement of findings.

[2] The transcript is not paginated. Therefore, when I discuss it later in this document, I cannot cite directly to "page and line" for the reviewer. Fortunately, it is only about thirty pages in length.

lives with his mother in Colorado.  He does not currently have any contact with his son and has not for about five years.

Defendant was arrested in the accompanying state case September 6, 2008.  The report indicates that on November 4, 2008 he was released on a $5,000 personal recognizance bond with conditions.  He has lived since November at a supervised halfway house connected with Summit Care and Wellness homes in Lincoln, where he is involved in intensive outpatient treatment.  He recently underwent a psychiatric evaluation, and currently participates in twelve-step meetings four days a week and has a sponsor.  He also attends intensive outpatient group meetings three days a week.  As of the date of the report, his state probation officer reported that he was in "full compliance" with his conditions of release, including no positive drug tests, maintaining employment, and in compliance with halfway house rules.  The state conditions also include curfew and electronic monitoring; the state's equipment apparently does not require a "land line" telephone, as does this court's, but the director of Summit Homes advised that she is willing to install a line if the defendant pays for it.

At the time of the supplemental hearing defendant was employed at Ameritas, a local insurance and financial services company, through Kelly Services.  His job is data entry on a non-internet accessible computer.  He works 10:00 a.m. to 6:30 p.m. Mondays through Fridays and makes just over $1,000 per month, net.  His father reported that defendant also "occasionally" helps him with his lawn service.

Defendant has essentially no assets, reporting only a 1989 Honda Accord he valued at $500.  He is approximately $4,000 in arrears in child support payments, and has medical bills estimated at $250,000.

Defendant's educational background includes graduating from high school plus some community college courses after his service in the Army.  He was in the Army from 1994 to 1998 and was honorably discharged with the rank of E4.  He later worked for General Electric in Boulder, Colorado and there took some "software program classes."

Marijuana and alcohol seem to be the defendant's major substance problems.  He reported that his drinking ranged from months of sobriety to binge drinking for a few weeks.  He reported his marijuana use also ranged widely, from once a month to daily.  He experimented with other drugs between ages 18 and 21, and also took a prescription pain killer not prescribed to him approximately five years ago.

Defendant has two prior episodes of treatment, presumably for alcohol and substance abuse.  The first was in 2001 when he was inpatient for two weeks and then participated in an outpatient program for three months, upon the completion of which he continued counseling with a psychologist.  The second was in 2007, when he was in a thirty-day inpatient program at Cornhusker Place in Lincoln, but did not complete the aftercare portion of the program, as he relapsed three to four months later.

He is under the care of a psychologist and also Lancaster Mental Health.  He is taking Zoloft for depression and anxiety, Alprazelam for anxiety, and Vivance for memory and attention deficit disorder.

Prior to the present case his only past criminal history consists of a conviction of misdemeanor minor in possession of alcohol at age 19.

The government's Exhibit 1, the report of the officer who examined defendants computer and Ipod, described finding nearly 50,000

image files and several movie files.  The report describes them as "suspected" or "possible" "child erotica/child pornography."  The most specific description of any of these materials is given as an example of the type of images or series of images:  "These [8] images all depict a young pre-pubescent boy, nude or [semi?] nude, with his penis exposed and facing the camera."  With that many images downloaded, it is doubtful that this is the most egregious of the defendant's cache of materials; nevertheless, that is the extent of the description provided in the exhibit.

Government's exhibit 2 is a transcript of an interview with the defendant conducted by and investigator and a sargent of the Lincoln Police Department on September 10, 2008.  It is approximately thirty double-spaced pages, and as such, is difficult to summarize succinctly.  In the interview the defendant describes how he downloaded the materials at issue here.  He reviews the kind of images on his computer, and disclaims any interest in "hard core" child pornography, that is, images showing children being sexually assaulted and/or penetrated, as such images are too "disturbing" to him; rather, he claims that his interest is only in so-called "soft sites."  He denies ever uploading, emailing, trading, manufacturing or creating any alleged child pornography.  He also denies ever sexually touching any child, including his son.

Defendant's Exhibit 101 is a description of Summit Care and Wellness, PC, including its Resident Rules and Regulations and its form authorizing random drug testing of residents which must be signed by a new resident upon admission to the program.  Of importance here is that the house requires an 11:00 p.m. curfew Sundays through Thursdays and 12:00 midnight on Fridays and Saturdays.  Absences must be noted on a sign-out sheet, and attendance at AA/NA meetings must be

verified.  A two-hour mandatory house meeting is held every Sunday at 5:00 p.m.  No pornographic materials of any kind are permitted.

     Defendant's proffer describes his "typical" schedule for a week, which includes on Sundays an individual session with a counselor, a house meeting, and an AA meeting; working on Mondays through Fridays from 10:00 a.m. to 6:30 p.m.; on Tuesdays a session at Community Mental Health Center in the morning before work, and an AA meeting in the evening; on Wednesdays an evening AA meeting; on Fridays an evening AA meeting; and on Saturdays a meeting with his sponsor in the morning.

## DISCUSSION

<u>Curfew</u>.

     The defendant is already subject to a curfew because of the Summit Care and Wellness, PC house rules.  Thus, the only thing this court could do in that regard is further restrict the hours of his absences from the halfway house.

     I do not consider this defendant to be a flight risk.  He has a longstanding residential connection with Lincoln, and his father, with whom he appears to have a positive relationship, lives here.  He has essentially no prior record, and certainly no record of failures to appear for court proceedings.  He has not failed to appear in the corresponding state case, and his probation officer reported that he is in full compliance with his conditions of release in that matter.  There are no reports of his failing to appear at any AA/NA meetings, counseling sessions, or other scheduled meetings.  He is employed full time here.  He has no significant ties to any other place.

It is important to note that the purpose of a curfew is to monitor someone's whereabouts if he or she poses a risk of flight. The evidence before the court is that for the last six months he has been on release without violation of conditions, including flight.

Electronic Monitoring.

Like a curfew, electronic monitoring is designed to lessen risk of flight by enforcing a curfew or other restriction on a person's presence at or absence from a given location, usually a residence. It has no ability to monitor a person's actual location, other than to report presence or absence from the place where the monitoring equipment is located. Like a curfew, it has no ability to restrict the person's actions while he is present at or absent from that location. Just as with a curfew, a defendant could be robbing banks, using drugs, or sexually assaulting children in his residence several times per week and so long as he was home by the appointed hour, or for the appointed duration, he would be in compliance with that condition of release. The electronic monitoring equipment would report a violation only if the defendant failed to return to the monitor's site or tampered with the ankle bracelet.

Electronic monitoring could potentially have utility in a case such as this by limiting a defendant's absence from home if, for example, the home is located close to a school, school bus stop, or other location where children are commonly found; that is, a defendant could be ordered to be at his home—-or away from it, depending on the particular circumstances—-during the hours children might be nearby. There is no evidence of any such circumstances in this case.

Defendant has been subject to electronic monitoring in his related state case.[3] While it is reported to not require a "land line" phone, there is no information about other differences between that system and this court's system. There is no evidence that he has violated any of the rules concerning electronic monitoring in his state case. Likewise, there is no evidence to the effect that but for the electronic monitoring, he would pose any significant risk of flight.

In fact, the government chose to obtain the defendant's presence at his initial appearance by summons rather than arrest warrant, and the defendant appeared on the summons issued by this court following his indictment. Filings No. 4, 8, and 9. The summons was issued on January 23, 2009 (when he was released on his state case) for an initial appearance on February 9, 2009. It was served on January 27; if defendant had wanted to abscond, he had time to do it before his scheduled appearance. He appeared without incident.

The evidence demonstrates that this defendant does not pose a significant risk of flight. Therefore, electronic monitoring is not necessary to lessen such a risk.

Danger to the Community.

The central concern with releasing a defendant accused of receipt or possession of child pornography is that he might be a sexual predator and while on release might commit a sexual assault on a minor. Indeed, that may be the interest Congress had in mind in

---

[3] While there was discussion to the effect that the state case would at some point be dismissed, I have no evidence or information that it has been dismissed at this time. It is likely that it will not be dismissed until this issue has been resolved in this court.

passing the amendments.  However, neither a curfew nor electronic monitoring is an effective deterrent against such a risk.

First, both restrictions have no ability to prevent bad behavior while a defendant is on his "schedule."  As noted above, he could, in fact, be behaving badly even while he is within range of an electronic monitor or in compliance with a curfew.  There is no evidence of such behavior in this case.

Second, there is no documented study concluding that all child pornographers are also child sexual predators.  There have been studies of limited populations concluding that there is broad overlap of the two sets of persons, but no study finding a perfect congruence of the two groups.[4]  Thus, while there may be some probability that a child pornographer may also be or become a child sexual predator, that conclusion cannot be said of any particular person, including this defendant.

Third, the defendant, it must be remembered, is presumed innocent.  While the evidence against him may appear to be strong (although the evidence before me did not describe the images with specificity, leaving the possibility, albeit slight, that the images are not within the statutory definition of "child pornography" at

---

[4] See, for example, Andres E. Hernandez, Ph.D., "Sex Offenders: To Detain or Not to Detain," Federal Judicial Center, November, 2008.  Dr. Hernandez, formerly the Director of the U.S. Bureau of Prisons' Sex Offender Treatment Program and Hypersexuality Management Program located at its Butner, North Carolina facility, concludes that while there is no perfect congruence, there appears to be a high correlation between the two groups.  Unfortunately, however, "child pornographer" is not defined in the materials; it is not known if it refers to persons who receive, possess, collect, and view child pornography, or just to those who create, upload, trade, or share it.  I consider the term to refer to both groups.

9

all)[5], at this stage of the proceedings it must be regarded as unproven.

Fourth, defendant has not been charged with any assaultive behavior of any kind, sexual or otherwise, ever. His statement to police denies any sexual "touching" of minors. He further described his view of "hard core" sexual assaults of minors as "disturbing." He also denied any uploading of images or sharing of images. While, of course, he could have been lying, he has not testified before this court, so I have no means to judge his credibility. The only *evidence*[6] before the court which describes his credibility is by Sgt. Donahue near the end of the transcript of that statement, "I think he's been pretty honest and forthright."

Fifth, the defendant has been released on conditions imposed by the state court since November, 2008, without incident. No violations of release have been reported. He is employed full time, and has no access to an internet-accessible computer at his work or at the halfway house. He is attending several sessions of personal therapy or substance abuse treatment throughout his weekly schedule. He is subject to electronic monitoring in his state case and to the restrictions of the halfway house, which include a curfew. There is no evidence, however, to the effect that but for those restrictions, there is a significant likelihood he would be violating his other conditions of release.

---

[5] For example, it is not shown that the "prepubescent boy" was involved in anything sexual at all; for all that is stated, he could have been undressing and frolicking at a nude beach.

[6] "The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 18 U.S.C. § 3142(f)(2).

Finally, the Bail Reform Act makes it *mandatory* to release defendants on the *"least restrictive"* conditions the court concludes are necessary to "reasonably assure" the attendance of the defendant at court sessions and the safety of the community. 18 U.S.C. § 3142(c)(1)(B). As pointed out in the previous memorandum, it is the government's burden to demonstrate that its proposed conditions of release are the least restrictive to reasonably assure the appearance of the defendant and the safety of the community. The government's evidence in this case is insufficient to demonstrate that these conditions are necessary to do that. There is, in fact, no evidence[7] before the court supporting a conclusion that either a more limited curfew or electronic monitoring, or the two of them together, would further the interest of "reasonably assur[ing] the safety of the community" from any danger posed by this defendant's release on less restrictive conditions.

CONCLUSION

In no other instance has Congress amended the Bail Reform Act to *substantively require* that particular conditions be imposed in particular cases, without the presentation of evidence. It has

---

[7] It is ironic that in objecting to my previous memorandum and order, the government complained that it was not afforded an opportunity to present evidence supporting its belief that the defendant's release posed a danger to the safety of the community. Such is the nature of a facial challenge to an irrebuttable presumption; the evidence on the particular case doesn't matter. In any event, no such argument was made before me, no request for an evidentiary hearing was made by the government in response to the defendant's objection/motion to amend, (see Filing No. 15), and the government has now presented its evidence.

altered the *burden of proof* as to certain defendants,[8] but it has not precluded the presentation of *any evidence at all*.  In fact, in all other respects the Act explicitly safeguards a defendant's opportunity to present evidence.[9]  By foreclosing even the possibility of presenting any evidence relevant to the issues of appearance and safety, these amendments make impossible any judicial consideration[10] of evidence relevant to a particular person's risk of nonappearance or risk to the safety of the community.

For the reasons set forth in my memorandum and order of March 20, 2009, Filing No. 19, and for all of the additional reasons discussed above, I conclude that the imposition on this defendant of a more limited curfew, or electronic monitoring, or both, are not necessary to reasonably assure this defendant's appearance and the safety of the community.  Neither would imposition of these conditions further the interests of the Bail Reform Act, and in fact, would be in direct contradiction with the Bail Reform Act's requirement of imposing the least restrictive conditions on his release.  Were it not for the requirements of the Adam Walsh Amendments of 2006, I would not, in the exercise of judicial consideration, impose either of these conditions on this defendant.

---

[8] For example, release of a person pending sentencing, 18 U.S.C. § 1343; or of a person on supervised release, Fed. R. Crim. P. 32.1(a)(6).

[9] "The person [defendant] *shall* be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise."  18 U.S.C. 3142(f)(2).  (Emphasis added).

[10] Throughout the Act there are multiple references to a *judicial officer's* making "findings" and "determinations."  See, e.g., 18 U.S.C. § 3142(c), (d), (e), and (f).

I adhere to my conclusion in Filing No. 19 that the amendments facially violate the defendant's constitutional right to due process of law.

Consideration of the actual evidence before the court on the supplemental hearing demonstrates the application of that conclusion as applied to this defendant. The evidence shows he is clearly eligible for release on less restrictive conditions, but the amendments preclude the consideration of such evidence. Therefore, I further conclude that as applied to this defendant, the amendments violate his constitutional right to due process of law.

DATED May 29, 2009

BY THE COURT:

s/ *David L. Piester*

United States Magistrate Judge